UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LARRY JACKSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:03-cv-0879-DFH-TAB |
| ) | |
| MARION COUNTY SHERIFF'S ) | |
| DEPARTMENT and FRANK J. ) | |
| ANDERSON, in his official capacity ) | |
| as Marion County Sheriff, ) | |
| ) | |
| Defendants. ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

While being detained in the Marion County Lock-Up awaiting a preliminary hearing on criminal charges, plaintiff Larry Jackson, who suffers from schizophrenia, was severely beaten by two fellow detainees. Jackson has sued the Marion County Sheriff ("Sheriff") in his official capacity under 42 U.S.C. § 1983.[1] Jackson alleges violations of his federal constitutional rights as a pre-trial detainee. Jackson alleges (1) that the Sheriff was deliberately indifferent to the due process rights of mentally ill detainees by failing to train officers adequately to identify the signs of mental illness in time to segregate them from the general Lock-Up population; and (2) that through a custom of overcrowding at the Lock-

---

[1] Jackson also has named the Marion County Sheriff's Department, but that adds nothing to his official capacity claim against the Sheriff. At the times relevant in this case, the Sheriff was Jack Cottey, who was replaced by Frank Anderson at the beginning of 2003.

Up, the Sheriff was deliberately indifferent to the substantial danger of inmate-on-inmate violence directly caused by that overcrowding. These policies or customs, he argues, led to his beating by fellow detainees.

The Sheriff has moved for summary judgment, arguing that Jackson has not offered sufficient evidence that the Sheriff had any unconstitutional policy or custom of deliberate indifference to the health and safety of detainees. The motion is granted in part and denied in part. It is granted with respect to Jackson's claim that the Sheriff had a policy of deliberate indifference toward mentally ill detainees but denied on the claim of overcrowding, which was a condition reflecting long-standing official policy of the Marion County Jail and Lock-Up.

*The Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is only appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only *genuine* disputes over *material* facts can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it might affect the outcome of the suit under the governing law, and

a dispute about a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

On a motion for summary judgment, the moving party must first come forward and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that he believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Where the moving party has met the threshold burden of supporting the motion, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Local Rule 56.1 requires the party opposing a motion for summary judgment to identify specific and material factual disputes by citing specific evidence.

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn from it, in the light reasonably most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); *Liberty Lobby*, 477 U.S. at 255; *Celotex*, 477 U.S. at 323; *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999). However, a non-moving party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record. *Liberty Lobby*, 477 U.S. at 252; *Packman v. Chicago Tribune Co.*,

267 F.3d 628, 637 (7th Cir. 2001); *Sybron Transition Corp. v. Security Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997). The court may not weigh conflicting evidence or choose from among conflicting reasonable inferences from that evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the non-moving party bears the responsibility of identifying the evidence upon which he relies. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). "If the non-moving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

*Undisputed Facts*

In light of the standard for summary judgment, the following facts are undisputed for purposes of the motion or reflect the evidence in the light reasonably most favorable to plaintiff. On May 19, 2001, plaintiff Larry Jackson was arrested by officers of the Indianapolis Police Department ("IPD") at the Westin Hotel in Indianapolis. Police Rep. at 1. Hotel security personnel told the IPD that Jackson had been warned after an earlier disturbance in May that he was not welcome on the property, but he had returned on May 19th and threatened to kill the hotel staff "and anyone who touched him." *Id.* at 2.

The IPD officers found Jackson barefoot in a tunnel connecting the hotel to the Indianapolis Convention Center.  *Id.* at 2.  The officers arrested him after a brief struggle.  *Id.*  After the arrest, Jackson tried to pull away from one of the officers and was subdued.  *Id.*  He again tried to break free of the officers as they put him in a vehicle to take him to jail.  *Id.*  Jackson was arrested for criminal trespass and resisting law enforcement, and was brought to the Marion County Jail ("Jail").  *Id.* at 1.  Jackson does not remember anything about the events surrounding his arrest.  Jackson Aff. ¶ 10.

At the Jail, Jackson went through a series of standard intake procedures.  Evrard Dep. at 7-10; Beatley Aff. ¶¶ 5-6; Durm Aff. ¶¶ 3-4, Ex. A.  First, the IPD officers asked him a series of basic questions, including questions about his medical condition.  Beatley Aff. ¶¶ 5-7.  They then collected his property and searched him for contraband and weapons.  After this screening, one of the officers completed a form signed by Jackson, indicating that Jackson had stated that he had no medical problems and was not taking any prescription medications.  Gohmann Aff. ¶ 10, Ex. B.

The Marion County Lock-Up is a holding area where detainees are kept until transferred to the main part of the Jail.  Under the Marion County Sheriff's standard intake procedures in May 2001, a detainee's path from arrest into the Lock-Up was well-delineated.  After the intake screening, a detainee would be interviewed by bail commissioners who helped the criminal courts determine how

to calculate the detainee's bail. Evrard Dep. at 10. Next, the detainee would be photographed and fingerprinted by the IPD. *Id.* at 10-11. If the initial hearing court was in session, the detainee could also be taken to court. Beatley Dep. at 24-27. If that court did not release the detainee, he would be placed in the Lock-Up until he was transferred to a cellblock in the main part of the Marion County Jail. *Id.*; Evrard Dep. at 11-12.

On May 21, 2001, Jackson had gone through all of these steps and was in cellblock C5B of the Lock-Up, waiting to be transferred to the Marion County Jail. Evrard Dep. at 7-11. He had an altercation with Kendall Tunstall and Michael Tunstall, two brothers who were also in the Lock-Up. Wildauer Dep. at 14. One of the officers investigating the incident testified, based on his questioning of numerous detainee witnesses, that Jackson "probably got into an argument or bumped into one of the Tunstall brothers who was sleeping up on a bunk." *Id.* at 13-14. Though the precise instigating event is unclear, both brothers severely beat Jackson. Cplt. ¶ 8.[2] Jackson suffered bruises, lacerations, contusions, broken ribs, a concussion, severe swelling of the brain, and head lacerations requiring staples. *Id.* ¶ 13. Jackson was treated at Wishard Hospital, where he remained in a coma for three weeks. *Id.* ¶ 11. Jackson has no memory of the beating or the events surrounding it. Jackson Aff. ¶ 10.

---

[2]All references to the complaint in this entry are to Jackson's first amended complaint.

Marion County Jail Policy No. 140, which was in effect at the time of Jackson's arrest and detention, stated that throughout the intake process and incarceration, Sheriff's employees should seek "to identify mentally impaired detainees who may have problems adapting to the detention setting or who may be imminently dangerous to themselves or others." Durm Aff. ¶ 3-5, Ex. A at 1. If such a "Special Needs Inmate" was identified, the Marion County Sheriff's policy required employees to alert a supervisor or medical staff, who could then make a referral for a mental health examination. *Id.*; Beatley Aff. ¶ 6.

The Sheriff asserts that all new correctional officers must receive training on mental health issues. See Gohmann Aff. ¶¶ 1-9. Specifically, the Sheriff has a policy requiring that:

> When an inmate exhibits behavior that is suicidal, homicidal, or otherwise extremely inappropriate, a psychiatric evaluation will be ordered by the Jail doctor or the Jail Administrator. Staff will be trained to be alert to possible indicators of acute mental illness, including the following:
>
> - Systematized delusions of persecutions, with the rest of the personality remaining relatively intact.
>
> - Delusions of grandeur and/or persecution, with hallucinations or a constant attitude of suspicion and hostility.
>
> - Intense anxiety or exaggerated levels of fear or panic in the absence of any real or present danger.
>
> - Inappropriate emotional responses, silliness, bizarre delusions, or unpredictable, hollow giggling.
>
> - Hallucinations such as hearing, seeing, tasting, or smelling something or someone that is not present at the moment.

- Extreme depression, withdrawal, neglect of hygiene and appearance, refusal to eat or leave cell for long periods of time or periods of uncontrollable crying.

- Exaggerated mood swings from elation and overactivity to depression and underactivity or a combination or alternation of these.

Durm Aff., Ex. A at 2.

All of the officers involved in the intake and screening process for Jackson, as well as those who worked in the Lock-Up on the weekend of Jackson's detention, were required to participate in a four-hour training program taught by mental health professionals from Midtown Mental Health Center. The program taught, among other things, how to identify schizophrenic inmates. Gohmann Aff. ¶¶ 3-5. These officers would have been taught some of the symptoms of schizophrenia, including "positive" or "psychotic" symptoms, which include delusions and hallucinations; "disorganized" symptoms, including confused thinking and speech, as well as nonsensical behavior; and "negative" symptoms, such as emotional flatness or lack of expression. *Id.*, Ex. A at 5. The program taught officers how they should interact with mentally ill detainees, explaining that officers should be patient and pay close attention to delusions and "minor complaints" that might reveal mental impairments. *Id.*, Ex. A at 4.

Under the Sheriff's procedures, officers had numerous opportunities to observe detainees in the Lock-Up. They could observe detainees during hourly

patrols known as "clock rounds," when they delivered meals to detainees, and when detainees were moved into or out of the Lock-Up. Beatley Aff. ¶ 9.

Jackson has offered evidence of the following additional facts related to his background and his actions surrounding his arrest and detention. Jackson was diagnosed with schizophrenia in early 1982, when he was 21 years old and serving in the United States Army. Jackson Aff. ¶ 1. Because of his mental illness, he was dishonorably discharged. After his discharge, he returned to Indianapolis, where he eventually became homeless. *Id.* ¶ 2. Jackson became involved in criminal activity and was arrested for a robbery in which a murder was committed. *Id.* ¶ 3. He pled guilty to robbery and was sentenced to twenty years in prison. *Id.* ¶ 4.

In 1994, after Jackson had been imprisoned in the Westville Correctional Facility for ten years, the Indiana Department of Correction had him committed to Logansport State Hospital because of his schizophrenia. *Id.* ¶ 6. Jackson's mother had him released from the hospital in 1995. *Id.* ¶ 7. After his release, he held a series of jobs, but was unable to earn enough money to support himself. He became homeless again, and was homeless at the time of his arrest on May 19, 2001. *Id.* ¶¶ 8-9. In addition to being barefoot at the time of his arrest, Jackson states that he was not fully clothed. *Id.* ¶ 9; Jackson Interrog. No. 13. Jackson is currently undergoing treatment for his schizophrenia, and his condition is controlled by medication. Jackson Aff. ¶ 12; Jackson Interrog. No. 6.

By 2001, overcrowding and other inmate conditions at the Lock-Up had been the subject of litigation for many years. The principal lawsuit was filed in 1972 and was still pending in 2001. See, e.g., *Marion County Jail Inmates v. Sheriff*, Cause No. IP 72-424-C (S.D. Ind.).[3] In a May 28, 1999 entry ("May Entry"), Judge Dillin specifically described overcrowding in the Lock-Up and its effects:

> The Lockup prisoner population had been capped at 213. In recent months, however, the population has exceeded this number by more than 50%. The plaintiffs have shown that this high population has strained, and in many situations resulted in a pervasive breakdown in, health and sanitation needs. More vividly, fights in the cellblocks are commonplace, supervision within the cellblocks is minimal, fortuitous, or non-existent, and injuries from the conflicts are an everyday occurrence. The delivery of basic human necessities – food, medical care, sanitation, and physical safety – to inmates in the Lockup is impeded by the high volume of persons for whom these necessities must be provided, which is to say for each prisoner in the Lockup. These conditions are precisely what past and present Indiana jail inspectors testified could be expected from a facility with overtaxed and insufficient resources. The space allocated per inmate in the Lockup . . . is paltry and below civilized standards. Though mass tragedy – riot fire, or similar events – has not occurred, the toll in individual human suffering of persons who may not be "punished" prior to conviction is immense and is wholly unjustified by any legitimate institutional goal in the management of the prisoner population in the Lockup. These are conditions of "current and ongoing" constitutional violations, and in this court's view are the result of the overcrowding in the Lockup.

---

[3]The court has granted Jackson's motion to take judicial notice of this litigation (see Docket No. 60). Jackson properly submitted the May Entry and the Verified Petition for Contempt and the Stipulation and Joint Motion to Continue Contempt Hearing (filed in May and June of 2001, respectively), as evidence the court may consider.

May Entry at 9-10. Three days before Jackson's beating, a Verified Petition for Contempt was served on the Sheriff, offering evidence that the Marion County Sheriff's Department ("MCSD") continued to violate the Lock-Up population cap of 213. Pl. Ex. F. The reported population of the Lock-Up, excluding weekends, between April 16, 2001 and May 11, 2001 ranged from a low of 139% of capacity (*i.e.*, 296 detainees) to a high of 198% of capacity (*i.e.*, 421 detainees). *Id.* at 3-4. MCSD population statistics show that on May 21, 2001, there were 550 detainees in the Lock-Up. Pl. Ex. H. In cellblock C5B, there were sixty detainees, but no more than forty-seven beds. *Id.*[4]

Detainee eyewitnesses to Jackson's beating described his behavior before the beating in tape-recorded interviews with two MCSD police sergeants.[5] One eyewitness described Jackson as "very weird," stating:

> when I got there at 2:30 in the morning I was just sitting minding my own business looking at the TV [and] he was making gestures at me. You know that he was gonna come and get me and s*** like that. He was talking to the (inaudible) all night long. Like the, he was talking to the pig all night long, pig open, just some weird stuff.

Pl. Ex. B at 2. Another eyewitness described Jackson's behavior in the Lock-Up:

---

[4]It is unclear from the MCSD's statistics whether there were forty or forty-seven beds in cellblock C5B on May 21, 2001.

[5]The unsigned and unsworn transcripts of those interviews, as well as material statements about the interviews made by one of the interviewing officers in his deposition, could be subject to a hearsay objection under Fed. R. Evid. 802. The defendants, however, have not objected to the admissibility of the transcripts, so the court may consider the transcripts in deciding this motion on summary judgment.

> Q: OK, but he didn't talk to you?
>
> A: No, he had uh he get like shake everyone and then he move his head and he (inaudible).
>
> * * *
>
> Q: Did you, was he walking around, was he ever holding his head or ever complaining of any pain to his head?
>
> A: Uh he was walking like uh like his head um some kind of compression.
>
> Q: Compression?
>
> A: Yeah.
>
> Q: You mean he was like he was depressed?
>
> A: Yeah.
>
> Q: Not in a good mood?
>
> A: Um no well I don't know. I (inaudible) walking that's when they uh (inaudible) and you know (inaudible) he was there sometimes (inaudible) shaking the feet (inaudible).
>
> Q: Like he was angry?
>
> A: I don't know I thought it was somebody I don't know if he ever been like that before. If he you know some people they need (inaudible) first time like that or you know. Or if he was on drugs before he was you know there's people like that. They can't stand it.

Pl. Ex. C at 1-2. A third eyewitness stated that Jackson "was kind of spastic all night," that he "kept jumping around," and that during the beating, Jackson "kept on waving his arms . . . like he's having a nightmare or something . . . ." Pl. Ex. D at 1.

*Discussion*

To recover damages under 42 U.S.C. § 1983, Jackson must establish that he was deprived of a right secured by the Constitution or laws of the United States by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Because Jackson was a pre-trial detainee, the relevant rights are those secured by the Fourteenth Amendment, rather than the Eighth Amendment's Cruel and Unusual Punishment Clause. See *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002).

Jackson has not sued any individual officers in their individual capacities. To hold a municipal government body like the Sheriff in his official capacity liable under § 1983, Jackson must demonstrate that the deprivation of his constitutional rights was caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or by an unwritten custom or practice so well established as to amount to a government policy. *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978). Such a policy or custom must "reflect[] deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 411 (1997). Jackson's claim requires him to prove both (1) that his constitutional rights were actually violated by the deliberate indifference of a municipal actor, see *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Monell*, 436 U.S. at 694; *Harris v. City of Marion*, 79 F.3d 56, 58 (7th Cir. 1996); and (2) that there is "a direct causal link

between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404.

Jackson claims that the Sheriff had two policies or customs that reflected deliberate indifference to the health and safety of detainees. The first was that the Marion County Sheriff, as a matter of custom, inadequately trained his officers to identify the signs of schizophrenia, thus putting schizophrenic detainees at risk of violence in the Lock-Up. The second was that the custom of continuous overcrowding at the Lock-Up made all protective measures ineffective.[6] He asserts that each of these customs contributed to cause his beating by fellow inmates.

I.      *Failure to Train on Mental Illness*

Jackson alleges that the Sheriff failed to train his officers adequately to identify the signs of schizophrenia, manifesting deliberate indifference to the substantial possibility that schizophrenic detainees would be subject to violence by other detainees. To the extent that Jackson pursues a claim for relief based

---

[6]In his complaint, Jackson alleged that the Sheriff did not "provide for procedures for segregating inmates, such as Jackson, who were irrational and unable to act in their own best interests." Cplt. ¶ 12. The Sheriff put forth, in his brief supporting the motion for summary judgment, substantial evidence that he segregates detainees who might be a danger to themselves or others, including mentally ill detainees. Jackson did not respond to this evidence with any of his own, instead stating that the overcrowding of the Lock-Up rendered the MCSD's segregation policy inadequate. This theory therefore adds nothing to the overcrowding theory, which is discussed below.

solely on the inadequacy of the Sheriff's policies for identifying and segregating mentally ill detainees, the Sheriff is entitled to summary judgment.

As a pretrial detainee, Jackson had not been found guilty of a crime, so the state could not constitutionally "punish" him. *Payne v. Churchich*, 161 F.3d 1030, 1040 (7th Cir. 1998). While in custody, he was protected by the Fourteenth Amendment, which offers protection at least as great as that offered by the Eighth Amendment. *Id.* A pretrial detainee, like a prisoner, is thus protected from the deliberate indifference of prison officials to his health and safety. *Id.*

Deliberate indifference is a relatively high standard. It requires evidence that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official is liable only when "the plainly obvious consequence" of his policy decision "would be the deprivation of a third party's federally protected right." *Brown*, 520 U.S. at 411.

The undisputed facts show that Marion County Sheriff requires officers to undergo training to identify inmates suffering from mental illness, including schizophrenia. Officers are required to monitor for characteristics of mental illness throughout the screening and detention process. An officer who notices

such characteristics is required to contact the medical staff, the mental health professionals, and his supervisor. The medical staff then diagnoses the detainee, and, if they determine that the detainee suffers from mental illness, they may send the detainee to the hospital.

Jackson has not come forward with evidence indicating that the Sheriff's policies to train officers to identify mental illness amounted to deliberate indifference to the health and safety of detainees. His response to the Sheriff's evidence of its mental health policies is merely to assert that overcrowding in the Lock-Up rendered any mental illness policies impotent. Thus, for the claim premised on an independent failure to train Lock-Up officials adequately, he has not made the required showing that the Sheriff was "aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger." See *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000).

II.     *Overcrowding of the Lock-Up*

On the overcrowding issue, however, there is sufficient evidence to present to a jury. Jackson has come forward with evidence of extreme overcrowding of the Lock-Up that was so prolonged as to amount to a government custom or policy reflecting deliberate indifference to likely violations of the constitutional rights of detainees. A jury could reasonably find on this record that the overcrowding presented a substantial risk of serious injury to detainees, that the Sheriff failed

to take appropriate steps to protect inmates in this situation, and that the failure caused the beating of Jackson. The Sheriff is not entitled to summary judgment on this claim.

Jackson has put forth evidence showing that at least as of May 1999 (27 years after the lead lawsuit was filed), the Sheriff was on notice that the overcrowded conditions of the Lock-Up led directly to inmate-on-inmate violence in violation of constitutional protections. In May 1999, for example, Judge Dillin found that due to overcrowding in the Lock-Up, "fights in the cellblocks are commonplace, supervision within the cellblocks is minimal, fortuitous, or non-existent, and injuries from the conflicts are an everyday occurrence. . . . These are conditions of 'current and ongoing' constitutional violations, and in this court's view are the result of the overcrowding in the Lockup." May Entry at 9-10.

Three days before Jackson was beaten, the Sheriff was served with a Verified Petition for Contempt asserting that the overcrowding continued. The Sheriff responded to this petition by moving for a continuance of the contempt proceedings to determine if interim measures would resolve "the overpopulation problems in the Marion County Lockup." Pl. Ex. G ¶ 4. The Sheriff points to some of these interim measures as evidence of his efforts to alleviate the overcrowding and to improve conditions in the Lock-Up. However, Jackson has put forth evidence that on the day he was beaten, the Lock-Up was packed far

beyond its 213 detainee population cap, and that the specific cell block where Jackson was kept was filled far beyond its capacity as well.

Though evidence of Jackson's mental illness is incapable of supporting an independent claim for relief, it is still relevant to the issue of whether the overcrowding presented a substantial risk of serious injury to Jackson. Likewise, the Sheriff's intake and segregation policies may indeed be relevant to determining whether the Sheriff took appropriate steps to protect detainees from the substantial risk of serious harm posed by overcrowding.

*Conclusion*

The Sheriff's motion for summary judgment is granted with respect to the failure to train claim and denied with respect to the overcrowding claim. The court will schedule a conference with counsel to set a new trial date.

So ordered.

Date:  December 8, 2005

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Hugh G. Baker Jr.
BAKER PITTMAN & PAGE
hbaker@bpp-law.com

Patrick Victor Baker
BAKER PITTMAN & PAGE
pbaker@bpp-law.com

Jeffrey S. McQuary
OFFICE OF CORPORATION COUNSEL
jmcquary@indygov.org

Timothy Eric Peterson
timothy@timericpete.com